JACOB FAUL, DEFENDANT IN ERROR, v. NORTH JERSEY
STREET RAILWAY COMPANY, PLAINTIFF IN ERROR.

Argued March 10, 1904—Decided November 14, 1904.

1.  It is not sufficient evidence of negligence in the motorman of an
    electric street railway, when about to start, or to increase the
    motion of, a heavily-loaded passenger car, that he turned on the
    power and released his brake so as to cause a passenger standing
    on the front platform to "swing to the side a little bit," or "fall
    a little to the side." From such a result alone the jury cannot
    reasonably and legitimately infer negligence of car operation
    against the carrier.
2.  The actual management of the car in such cases, not the result-
    ant effects, should determine the question of the carrier's negli-
    gence.

On error to the Essex Circuit Court. This case was tried
before Judge Adams and a jury, and judgment rendered
for the plaintiff below.

For the plaintiff in error, *Chauncey G. Parker.*

For the defendant in error, *Samuel Kalisch.*

The opinion of the court was delivered by

VREDENBURGH, J. The refusal of the trial court, at the
close of the evidence, upon the defendant's motion, to direct
a verdict in its favor on the ground that no negligence im-
putable to it had been shown, brings, under exception, the
whole record of the case here in review. Unless from the
established facts such negligence might reasonably and legiti-
mately be inferred by the jury, such a direction was the right
of the defendant. It is certainly clear law that the mere
fact of a passenger's fall while standing on the platform of
a street car raises, in itself, no inference of negligence in its
operation by the car company. We are not at liberty, under
well-settled authority approved by this court, to deduce negli-

gence on the carrier's part from the occurrence alone of such an accident. *Paynter* v. *Bridgeton, &c., Traction Co.,* 38 *Vroom* 619, and cases there cited. In the case in hand the incident from which this controversy grew happened February 5th, 1901, on a very cold, stormy and exceedingly windy night, accompanied at times by hail and snow. The plaintiff, in his testimony, thus briefly relates the affair: The car he boarded was very crowded with passengers inside, and the rear platform, on which he stood, "was crowded, too; * * * I had a little dinner-pail in my hand—in one hand; * * * I held the railing with my right hand; * * * I fell off the car; * * * they drove on slow, and drove a little ways, then the car took a jolt, * * * and that jolt throwed me * * * from the platform; * * * car had gone, maybe, a hundred feet."

Reasoning from effect to cause, it was insisted on behalf of the plaintiff that the alleged "jolt" was a fact from which the jury could legitimately infer that the motorman had started his car forward with such extraordinary violence as to constitute actionable negligence on the part of the company. No claim was made that the tracks, or switch, or roadbed were in any way defective or could have caused any such jolt. The track was straight and the grade level. The controversy was therefore narrowed to the alleged negligent conduct of the motorman in releasing his brake or in turning on the power, or both, after leaving the switch where the car had stopped. I think it will be found, from an examination of the evidence of the only witness for the plaintiff who observed the action of the motorman, that his car was managed with due care, both before and co-incidentally with the accident. The position in which the plaintiff himself stood—in a crowd upon the edge or step of the rear platform—necessarily prevented him from observing the methods of managing the car pursued by the motorman on the front platform. The plaintiff had therefore to rely upon other testimony to prove the negligent operation of the car, and produced a Mr. Seyfarth as his witness for that purpose.

The pertinent facts stated by this witness were that he rode, on the night in question, on the front platform of the car because he couldn't get on the rear on account of the crowd there; that he stood alongside of the motorman both before and after the accident; that after crossing the Jones street line the car stopped, and he took the switch-iron and turned the switch for the motorman, and then the car proceeded on its way; that when they got up to Fifteenth avenue, near a grocery store, there was a wagon backed up against the curbstone that brought the hub of the front wheel very close to the car, and he said to the motorman that he didn't think the hub of the wheel would clear the rear step of the car; that then the motorman "slowed up" his car so as to avoid hitting the wagon; that he stood up, holding himself on the dash or little rails that run along to protect the windows from breaking. He thus described what followed: "I wanted to see whether this hub of the wheel would touch the rear end of the car—that is, the steps of the car—so I leaned over and looked—kind of judged up the distance between the hub of the front wheel and the rear end of the car—and I said it was 'all right.'

"*Q.* You said to whom that it was all right?

"*A.* To the motorman.

"*Q.* And what was done then?

"*A.* The motorman went right ahead then; and just as he did—why, I saw a man fall off the back platform, while I was watching there.

"*Q.* Now, what had the motorman done before he approached that wagon as to the speed of the car?

"*A.* Well, he saw the wagon there, and he was just as much in doubt as I was, and kind of slowed up.

"*Q.* Now, when the car went ahead, what did he do in order to give the car speed?

"*A.* I could not see what he done, because I was looking out the other way.

"*Q.* What did you feel, if anything?

"*A.* I felt the car go ahead.

"*Q.* Well, how?

"*A.* You can't feel very much in the front as you can at the back, because I was holding myself, and, naturally, I *swung a little bit to the side,* but it wasn't very severe in the front.

"*Q. It did swing you to the side, did it?*

"*A.* Yes, sir; *a little bit.*"

Upon cross-examination he said:

"*Q.* Then there was nothing unusual about the starting of the car that night, was there?

"*A.* Well, not just at that moment.    *    *    *

"*Q.* It started just as cars ordinarily do?

"*A.* Well, just according to the motorman.

"[Question repeated.]

"*Q.* There was nothing unusual about the starting of the car that night, was there?

"*A.* Certainly there was; I told you so in the last trial    *    *    *

"*Q.* Did you, anywhere in your testimony at the last trial, swear that the car started with any unusual motion?

"*A.* Well, there are two ways for me to answer that.

"*Q.* Well, answer it both ways, then?

"*A.* I said it all depends upon how the motorman starts the car;    *    *    *    well, I fell a little to one side."

From these facts, stated by the witness—not from his opinion nor conclusions thereon—could the jury reasonably and legitimately infer the negligent management of the car by the motorman? No passenger inside of the car, whether standing or sitting, testified that he noticed any jolt of the car. That expression was only used by the plaintiff. Admitting, for the sake of the discussion, that the slowing up of the car to avoid the wagon and the increase of speed after clearing that obstruction may not have been done skillfully, it by no means follows that it was done negligently. There is a wide distance between want of skill and negligence. The motorman certainly acted discreetly in avoiding collision with the

wagon. Obliged, as he was, to stand on the front platform, exposed for hours to the hail and blasts of a stormy winter's night, it would not have been at all surprising if his eye had miscalculated the distance from the track of the obstructing wagon, or his cold hand had slipped for a moment from the metal handle of his brake. If from such misadventure or unskillfulness the "jolt" in question resulted, can it be reasonably affirmed that he acted negligently? His method of starting or increasing the speed of his car was not testified to have been even unskillful, much less negligent. In order to resume his progress, after "slowing up" and avoiding the wagon, he was, of course, compelled to turn on his power and release his brake, the effect of which was to cause the plaintiff's witness, who was standing, to swing to the side "a little bit," or "fall a little to the side." No court, certainly, of this state, has yet declared that such an effect justified an inference of negligence in car operation against the carrier. On the contrary, in *Burr* v. *Pennsylvania Railroad Co.,* 35 *Vroom* 30, the Supreme Court, Mr. Justice Van Syckel writing the opinion, declared that if there is no more violence and lurching than ordinarily attends the starting of a railroad train, the jury cannot draw from it the inference that the company was negligent; and that *"it was not until extraordinary lurching and violence was shown that negligence could be presumed,"* &c.

In *Corkhill* v. *Camden and Suburban Railway Co.,* 40 *Vroom* 97, where a passenger was thrown to the floor by the lurch of a street car, occasioned by the motorman suddenly increasing the speed of his car to avoid a collision with a railroad train, the act of the motorman was held not to constitute negligence in the operation of the car. The court regarded the actual management of the car as the only correct test of negligence. The sudden jerk in starting a street car by a driver whipping up his horses, which threw down a passenger standing on the car platform, was the subject of decision of this court in *May* v. *North Hudson Railway Co.* 20 *Id.* 445. The principle there settled was, I think,

identical with that involved in the case at bar. In that case the car (drawn by horses) was full of passengers and the plaintiff was standing on the platform. The track was straight and the grade about level. The driver stopped, or almost stopped, the car for a lady to alight, and after she had alighted he whipped up his horses and, according to the testimony, the car gave a sudden jerk, which threw the standing passenger off the platform and he was injured. The close correspondence between the facts of this case and the present is too apparent to need comment. The driver there "whipped up" his horses in order either to start his heavy and crowded car quickly, or to keep it in motion, and the motorman here "whipped up" his electrical current for the same purpose. The result in each case was the same—a passenger, standing on the platform, was claimed to have been thrown from each car. In each case it was necessary to apply sufficient force to start a heavily-loaded car, and the nice adjustment of the exact amount of power necessary was therefore difficult of calculation. This court held that the jerk of the car, resulting from the sudden whipping up of the horses, did not afford evidence of negligence in the driver. Nor can the evidence in the present case, consistently with that ruling, it seems to me, establish negligence in the motorman. The change from horse-power to electric propulsion brings into use a still more difficult agent to control, but the basic principle of the law of negligence has not changed. There are a large number of cases decided by the courts of this state, and of various other jurisdictions, upon the general subject of the negligence of car companies in cases where passengers have been thrown from the platform of cars under a variety of circumstances, but reference to them would not materially assist us here. The only decision of this court which it may be well to distinguish from the case in hand is that of *Consolidated Traction Co.* v. *Thalheimer,* 30 *Vroom* 474. In that case the passenger, who was thrown off the street car in the act of alighting by a lurch or jerk of the car, had notified the conductor of her desire to get off at a certain street, designated

by her, and after the conductor had called out the name of that street had arisen and gone to the rear door in preparation of alighting. This court held that, under those circumstances, the jerk of the car justified an inference of some breach of duty owed to her by the carrier. Manifestly the conduct of the company's agent was an invitation to alight and was calculated to put the passenger off her guard at the very time she had the right to expect the car would become stationary. No such fact appears in the case at bar. That case is readily distinguishable from the present by the above circumstantial statement. The two cases rest upon different principles of classification.

At least two witnesses for defendant testified that they saw the plaintiff before he fell (in attempting to grab hold of his hat to prevent the wind blowing it away) release the only hold he had upon the railing of the moving car just before he fell off. This evidence the plaintiff, although afterwards recalled as a witness in rebuttal, did not attempt either to controvert or to explain. This being undenied, the wonder is not that he fell off the platform of the starting or moving car on that very windy night, but that he retained, without the hold of either hand upon the car, his precarious footing there for any length of time at all. But whether or not the nature of the start or increased motion of the car was of such a character as to have been alone instrumental in causing the plaintiff's fall, the motorman's management of the car seems, under all the evidence, to have been duly careful and without negligence. The accepted rule in actions founded upon negligence is that when the plaintiff shows that he was injured through some act of the carrier's servant, which might have been prevented by due care, that if the carrier proves that such care was in fact exercised, negligence cannot be inferred by the jury. *Whalen* v. *Consolidated Traction Co., 32 Vroom* 606, and cases there cited.

The judgment below should be reversed.

*For affirmance*—None.

*For reversal*—THE CHANCELLOR, DIXON, GARRISON, FORT, SWAYZE, BOGERT, VREDENBURGH, VROOM, GREEN.   9.