QUICK *v.* WYANDOTTE & DETROIT RIVER RAILWAY.

CARRIERS — PASSENGERS — PERSONAL INJURIES — SUDDEN JERKS — EVIDENCE.

    In an action by a passenger for injuries claimed to be the result of plaintiff's being thrown from defendant's car by a sudden jerk, evidence examined, and *held*, insufficient to show that there was any jerking of the car which was not incident to the ordinary running of electric cars over suburban lines.

Error to Wayne; Hosmer, J. Submitted February 14, 1906. (Docket No. 173.) Decided March 27, 1906.

Case by Joseph Quick against the Wyandotte & De-
troit River Railway and the Detroit United Railway for
personal injuries.   There was judgment for defendants
on a verdict directed by the court, and plaintiff brings
error.   Affirmed.

*James H. Pound*, for appellant.

*Brennan, Donnelly & Van De Mark*, for appellees.

MOORE, J.   This is a personal injury case, brought by
the plaintiff against the defendants.   The circuit judge
directed a verdict in favor of defendants.   The case is
brought here by writ of error.

The sole question involved is, Should the case have been
submitted to the jury ?   In January, 1903, the plaintiff
lived near Sibley stone quarry.   In the evening he went
to Trenton, and after spending some time there, he got on
a suburban car going north to go home.   He remained
upon the rear platform, he says, because he was smoking.
There were but two passengers inside the car.   He paid
the conductor by giving him a ticket which would allow
him to ride to Mud street which is the first regular stop
north of Sibley switch, and is about 1,300 feet north of the
north end thereof.   Sibley switch is also a stopping place
for the cars.

Plaintiff's version of the affair, on the direct examin-
ation, is substantially as follows :

"When I first got upon the car I told the conductor
where I wanted to get off, saying I wanted to get off at
Swanson's stop, a regular stop of the road.   There is also
a stop called the Sibley Quarry stop, about 80 rods from
Swanson's, I should judge.   As the car got pretty near to
Swanson's I saw that the conductor was not going to stop,
and I pressed the button.   I could not tell whether the
electric bell rang.   He passed the crossing to the next
one, and I pressed it again.   I saw he was talking to a
young lady in there, and I thought perhaps he did not
hear the bell, so I signaled a second time.   The car also
passed Sibley's Quarry stop.   The second time I pressed
the button the conductor kind of turned around as though

he was going to pull the bell, and I walked around the other gentlemen that were standing there so as to get ready to get from off the car. I slipped by the car jerking. The next I knew I was at my house pretty badly bunged up."

On the cross-examination he testified:

" *Q.* So you stood on the back platform? ·

"*A.* Yes, sir. There were three others with me—Fred Dickman and Salliotte and another man, I didn't know. I rode on a local ticket—three for 10 cents. I use those cars a great deal, and know about the prices. I have lived in that district all the while. Have lived right there in Monguagon, and within six miles of Trenton. Was there before the electric road was built. Worked at Sibley's and used to go down to Trenton quite often. Most of my business is done in Trenton, so that I used to make quite a number of trips over that line. I used to come up to Detroit now and then, and did at that time. The car didn't stop at Swanson's switch, but went on. In fact it went by my house. I can't tell just exactly how many feet north of my house I fell off. The car was going pretty fast; going about as fast as I ever rode on. I don't know that they go any faster at night than in the daytime. I don't know how far beyond my house I was carried by the car. It was pretty near up to Mud street, somewhere, I think.

" *Q.* Now, you came to Swanson's switch, you say, and then went on over the loop, or at least around the switch there, and on beyond Sibley's and when you found you were going by your house you pressed the button, did you?

"*A.* I pressed the button just as they crossed the Swanson's stop. That is where I wanted to get off.

" *Q.* And then you pressed it again when you saw you were going by your house, didn't you?

" *A.* Yes, sir.

" *Q.* And still the car didn't stop?

" *A.* No, sir.

" *Q.* And then did you press it again?

" *A.* No, sir.

" *Q.* You saw him ring the bell?

" *A.* I saw him turn around. I supposed he was going to pull the bell.    *    *    *

" *Q.* And if he had pulled the bell you knew the car

would not stop until Mud street, because that was the next stopping place ?

"*A.* That was the next stopping place. * * * From Swanson's switch to Mud street is about half a mile in my judgment. I knew the motorman would not stop until he got to Mud street, because that was the next stopping place after he had passed my place. I was still standing on the back platform, and I walked around this other fellow. I says, 'I will be ready to get off at Mud street.' They will stop, and I would walk back because I did not want to delay the car.

"*Q.* And you made over toward the step ?

"*A.* I walked around this other gentleman.

"*Q.* Then how was it you got off before the car stopped ?

"*A.* Well, that is what I don't know."

He also testified he thought there must be a curve in the road that caused the jerk or jar.

Mr. Salliotte, a witness for the plaintiff, lived with him, and on the direct examination gave the following version:

"When we started home we were together, and Mr. Quick, myself, and Mr. Dickman were on the rear platform. I was not inside the car at all. The electric road runs first along the east side of Washington avenue, just outside and north of Trenton, and then crosses to the west side. When plaintiff got on the car he told the conductor to let him off at Swanson's. We went along as usual until we got to near Swanson's, and, there being no appearance of stopping, plaintiff pressed the electric button to signal a stop. I could not say that I heard the ring of the bell. At the time the conductor was in the car talking to a young lady. But there was no slacking off of the speed of the car. Then he pushed it twice. Our destination was the same, plaintiff's and mine. Also Mr. Dickman. The plaintiff was standing right ahead of me, and he fell, head first, and I went in the car and told the conductor that one of his passengers was hurt, and they backed up the car, and me and the motorman and the conductor picked him up, and I took him home.

"*Q.* What was it that happened just about the time that he fell out, that you noticed, if anything ?

"*A.* He fell head first.

"*Q.* What caused him to fall ?

"*A.* I could not say how he fell. I don't know. I seen him fall."

On the cross-examination, among other things, he said:

"After you pass Sibley's switch, you go north about 16 rods, and you come opposite the house that the plaintiff and I lived in. I didn't do anything to stop the car; didn't press the button when I saw we were going by the house. I was to get off the same place the plaintiff was. I was simply following him. After the car went by Swanson's and Sibley's switch, I knew that the car would not stop again until it got to Mud street. So I waited for the car to stop at Mud street. I was going to press the button before we got to Mud street. I was standing on the back of the platform facing the front until after plaintiff had fallen. I saw plaintiff walk over toward the step after he had pressed the button. He went right by me. He fell head first into the street; that is all I saw.     *     *     *

"*Juror:* Right along there where he fell off did the track run straight or was there a curve?

"*A.* Straight; that is, I think it did. I am not sure."

Redirect examination:

"*Mr. Pound:* You say this man dove off?

"*A.* The car gave a kind of a— (Objected to.) He said he could not say what made him fall.

"*Q.* The car gave him a kind of what?

"*A.* Gave kind of a jerk before he fell."

Later the plaintiff was recalled when the following occurred:

"*Mr. Pound:* One thing I omitted to ask you. At this place you got pitched off at, is the road level or hollow, or what is it around there?

"*A.* It is hollow; there is a big dug-out there, a big hole there.

"*Q.* There is a big gully there?

"*A.* Yes, sir.

"*Q.* What can you say as to whether or not at that gully the road is perfectly straight or has got a turn in it or a crook in it?

"*A.* There was at that time a little short turn. The car would go right down just like that (illustrating).

"*Q.* Is it the same now?

"*A.* I don't know. I have not been over it in a long time."

Cross-examination:

"*Q.* To get back to this gully. You say at that time there was a gully there that the car went up and down over?

"*A.* Yes, sir.

"*Q.* But you don't pretend to say that there was any curve in that track?

"*A.* There was at one time; yes, sir. I noticed it particularly.

"*Q.* Didn't you tell me this morning that you didn't know that there was any?

"*A.* Right there; yes, sir.

"*Q.* What do you mean by a curve in the track when you speak of a curve? You mean going up and down a hill, is that it?

"*A.* That is a curve; yes, sir.

"*Q.* And you don't mean that it curved to right or left?

"*A.* There was, yes, sir, about — within about a rod from where this started down the hill there, there was a little short turn there; yes, sir.

"*Q.* And this gully you spoke of is near Mud street, isn't it?

"*A.* Yes, sir; right to the foot of Mud street.

"*Q.* Right there at the foot of Mud street?

"*A.* Yes, sir."

The plaintiff said he had not been drinking that evening.

Mr. Mexico and Fred Dickman were sworn as witnesses for plaintiff, but this testimony was not more favorable for plaintiff than what we have quoted. The conductor and the passenger in the car gave a very different version of what occurred. It is not important to set out their testimony. Blue prints of the line from Mud street to Sibley's switch, between which points, according to all the witnesses, the accident occurred, were offered in evidence. These show a perfectly straight track with a depression just south of Mud street of 4 feet in 200. There are no switches between Sibley's switch and Mud street. No

one can read the record without reaching the conclusion that there was no jerking of the car which was not incident to the ordinary running of electric cars over suburban lines.    We do not think plaintiff made a case which should have been submitted to the jury.    See *Etson* v. *Railway Co.*, 110 Mich. 494; *Bradley* v. *Railway Co.*, 94 Mich. 35; *Conroy* v. *Railway*, 139 Mich. 173.

Judgment is affirmed.

McALVAY, GRANT, BLAIR, and MONTGOMERY, JJ., concurred.