OTTINGER *v.* DETROIT UNITED RAILWAY.

1. CARRIERS—STREET RAILROADS—STARTING AND STOPPING CARS.
    Street cars may be started without waiting for passengers to
    reach a seat, unless there is some special and apparent rea-
    son for adopting a different course.[1]

2. SAME.
    To stop a rapidly moving street car that contains standing
    passengers, for whom there were no unoccupied seats, so
    suddenly as to break the hold of a passenger upon the back
    of one of the seats, is not in itself negligent, in the absence of
    evidence that it was an unusually sudden stop or that plain-
    tiff's fall was caused by something other than her momen-
    tum, resulting from the rapid motion of the car. MOORE
    and BIRD, JJ., dissenting.

Error to Wayne; Donovan, J. Submitted October 28,
1910. (Docket No. 137.) Decided June 2, 1911.

Case by Mabel Ottinger against the Detroit United
Railway. A judgment for defendant on a verdict
directed by the court is reviewed by plaintiff on writ of
error. Affirmed.

*Lehman, Riggs & Lehman* and *Proctor K. Owens,*
for appellant.

*Corliss, Leete & Joslyn* (*Frederic T. Harward,* of
counsel), for appellee.

HOOKER, J. The plaintiff, a married woman, in com-
pany with another woman, and plaintiff's husband,
boarded one of defendant's street cars. The car started
before she secured a seat; the car being well filled and
unoccupied seats few. She caused her lady friend, a
guest, to take the first vacant seat she came to, and con-

[1]As to starting street car before passenger is seated, see notes in
42 L. R. A. 294, and 4 L. R. A. (N. S.) 558.

tinued forward in the car.  As she stood holding onto a seat, a passenger moved to make room for her, and she turned to sit down.  At that moment the brake was put on to stop the car at a switch, and she fell forward and was injured.  She said that the car stopped so suddenly that her hold on the seat was broken, and she was thrown forward against the corner of a seat that she was holding, because the car was shaking so that she could not balance herself.  The car was running very fast, though, as she knew, it had but half a block to run before making the required stop.  She testified that the stop was sudden, without slowing down.  The witnesses agree that the car was stopped abruptly, and that this caused her to fall. The circuit judge directed a verdict for the defendant upon the ground that negligence was not shown, and plaintiff has appealed.

Counsel for the plaintiff rely upon the cases of *Beattie* v. *Railway*, 158 Mich. 243 (122 N. W. 557), and *Howell* v. *Railway Co.*, 136 Mich. 432 (99 N. W. 406); but we think they are not conclusive of this question.  The former related to the starting of a car before the passenger was upon the car, the latter to the failure of brakes to work.

It is a well-known fact that steam and street cars are not so stopped that the standing passengers can avoid the tendency to fall without effort, and the same is true when the car starts.  Not only is the making of time prohibitive of such deliberate starting of heavy vehicles as to avoid this, but the variation in the working of brakes prevents absolute uniformity in stopping.

The general rule adopted by the courts is that street railway companies are not required to defer starting cars until all passengers are seated, and that a train or street car "may be started without waiting for a passenger to reach a seat after entering a vehicle, unless there is some special and apparent reason to the contrary."  In the case of *Louisville, etc., R. Co.* v. *Hale*, 102 Ky. 600 (44 S. W. 213, 42 L. R. A. 293), this rule was adhered to in

the case of a fleshy woman, incumbered with a number of children, when she had an escort with her.  For the rule as to steam cars, see *Yarnell* v. *Railroad Co.*, 113 Mo. 570 (21 S. W. 1, 18 L. R. A. 599); *Louisville, etc., R. Co.* v. *Hale, supra.*

There is quite as much justice in the application of the rule to street cars which are usually started as soon as the passengers enter, and in which, for the want of seats, choice, or other reasons, passengers frequently ride standing in the car or on the platform.  So common and unavoidable is the overcrowding of street cars that straps are usually provided, and, if these cars could not lawfully be started until all passengers were seated, or if acceleration of and checking speed could not be prompt, the efficiency of such cars would be seriously impaired.

In Massachusetts it was held that a street car company owes no duty to a woman passenger, who is apparently strong and healthy, to wait after she has entered the body of the car, until she is seated, before giving the signal to start, or to notify her that it is about to give such signal. *Weeks* v. *Railway Co.*, 190 Mass. 563 (77 N. E. 654).

In *Herbich* v. *Railway Co.*, 65 N. J. Law, 381 (47 Atl. 427), it was held error to refuse to charge that the starting of a car before a passenger is seated is not negligence.  This was in the case of injury to a young child thrown from a car after she and her mother had entered it.  The rule was applied to a man 70 years old and weighing 220 pounds who was injured while passing from the platform to a seat. *Sharp* v. *Railroad Co.*, 111 La. 395 (35 South. 614, 100 Am. St. Rep. 488).

The evidence indicates that the plaintiff's equilibrium was lost by reason of the sudden slowing of the car for its stop. There is no evidence that justifies the belief that it was an unusually sudden stop, or that there was any reason for plaintiff's falling, but her momentum, which naturally impelled her forward as the car slowed down, and that happens to a greater or less degree every time a car is stopped.  No one else in the car seems to have suffered

from it.   In case of necessity, a motorman must stop his car as speedily as possible, for the unforeseen is ever confronting him.   Sudden stops are one of the ordinary conditions of trolley travel and are to be expected and guarded against by the passengers.   The motorman cannot know what his passengers are doing and whether they are standing or walking in the car or not, and he must devote his attention to the management of his car in the ordinary way.

In *Quick* v. *Railway,* 143 Mich. 443 (107 N. W. 104), we held that a jerk of a car sufficient to throw one standing on the platform to the street was only an incident to the ordinary running of electric cars, and sustained a directed verdict.   The same should be said of this stopping of the car.   See, also, *Bradley* v. *Railway Co.,* 94 Mich. 35 (53 N. W. 915); *Etson* v. *Railway Co.,* 110 Mich. 494 (68 N. W. 298); *Schultz* v. *Railways Co.,* 158 Mich. 665 (123 N. W. 594, 27 L. R. A. [N. S.] 503); *McCauley* v. *Railway Co.,* 169 Mass. 301 (47 N. E. 1006).

In *Holland* v. *Railway Co.,* 155 Mass. 387 (29 N. E. 622), a passenger was thrown from a car by its up and down motion.   The court held that there was nothing extraordinary in the motion, although it was so marked as to throw another passenger against the driver.   See, also, *Stewart* v. *Railroad Co.,* 146 Mass. 605 (16 N. E. 466).

It is the normal condition, in rapidly moving cars, that it is difficult for passengers to keep their feet, especially when the cars are stopped or started.   In the language of McSherry, J., in *Baltimore, etc., Turnpike Road* v. *Cason,* 72 Md. 381 (20 Atl. 113):

"It is notorious that just such motions as the appellee described, are of frequent and common occurrence in the running of street cars.  'Judges cannot denude themselves of the knowledge of the incidents of railway traveling, which is common to us all.'"

In *Faul* v. *Railway Co.*, 70 N. J. Law, 795 (59 Atl. 148), it was said:

"The controversy was therefore narrowed to the alleged negligent conduct of the motorman in releasing his brake or in turning on the power, or both, after leaving the switch where the car had stopped. * * * Admitting, for the sake of the discussion, that the slowing up of the car to avoid the wagon and the increase of speed after clearing the obstruction may not have been done skillfully, it by no means follows that it was done negligently. There is a wide difference between want of skill and negligence. * * * In order to resume his progress after 'slowing up' and avoiding the wagon, he was, of course, compelled to turn on his power and release his brake, the effect of which was to cause the plaintiff's witness, who was standing, to swing to the side 'a little bit' or 'fall a little to the side.' No court certainly of this State has yet declared that such an effect justified an inference of negligence in car operation against the carrier."

There is nothing in this case to show any negligence on the part of the company, or, as the learned circuit judge said, to treat this other than as a casualty for which defendant was not to blame.

The judgment is affirmed.

OSTRANDER, C. J., and MCALVAY, BROOKE, BLAIR, and STONE, JJ., concurred with HOOKER, J.

MOORE, J. ( *dissenting* ). This action is brought to recover damages for injuries received by plaintiff, a married woman, who claims she was violently thrown forward and down while a passenger, because of the negligent stopping of the car by the motorman. At the conclusion of the testimony the trial judge directed a verdict in favor of defendant.

The only question necessary to discuss is whether the case should be decided as a matter of law, or whether, as plaintiff claims, it should have been submitted to the jury.

The plaintiff, with her husband and a friend, took a car going south on Oakland avenue at Chandler avenue.

There are two tracks on Oakland avenue.   Cars going toward the city use the west track, and cars going out to the city limits use the east track.   The car they took was a closed car with seats running across it, and an aisle along the right-hand side of the car to one facing the front.   There were no straps or anything to hang to above that aisle in that car.

Plaintiff's account of the accident is as follows:

"There are two tracks on Oakland avenue.   Cars going toward the city use the west track, and cars going out to the limits use the east track.   The car we took was a closed car with seats running across it, and the aisle on one side.   The aisle was on the right-hand side of the car to one facing the front, going toward the city.   There were no straps or anything to hang to above that aisle in that car.   When my husband pushed me through the door, I saw but one vacant seat, and I told my friend to take that; I was more used to the cars than she was. * * * After inviting her to take that seat, I tried to work forward from the side door.   * * *   I worked toward the front and took hold of the back of the front seat facing the motorman, and somebody made room for me on the end of the seat, and I was trying to turn around so that I could sit down.   I intended to sit on the seat that faces the motorman, the one looking south.   I had my hand on the back of that seat.   Just as I was turning around, before I had a chance to turn around and sit down, the car stopped so suddenly it broke my hold and threw me forward and struck me right there in that breast (indicating) against the corner of the front seat where you sit with your back toward the motorman, I struck against the corner nearest the door, and that hit me right under the left breast, and then I bounced back, and it struck me down at the lower part of the spine.   The seat back of me, the one I was intending to sit in, struck my spine.   Then I went down on the floor, and I tried to save myself and sprained my right thumb.   I could not have had my hand on the seat long before I fell.   It was just as soon as I could get hold of it after I got into the car, but the car was shaking so I could not balance myself, and I took hold of that to hold myself from falling.

"*Q.* Was the car in that rocking position from the time you got into it?

"*A.* The car seemed to be going so fast I could hardly keep myself on my feet, and I reached and got hold of the back of that seat. When I fell I fell right between those seats where I was going to sit."

Part of the cross-examination is as follows:

"*Q.* You got on the car all right?

"*A.* Yes, sir; with the assistance of my husband.

"*Q.* And the accident happened when you got on the car all right?

"*A.* It happened when it stopped at Clay. I got up the steps all right. I say it stopped at Clay.

"*Q.* Do you know what made it jerk?

"*A.* Going so fast and stopping so suddenly.

"*Q.* Did you see the motorman stopping it suddenly?

"*A.* I did not look at the motorman; I knew the car stopped suddenly.

"*Q.* You do not know what made it; you did not run into anything?

"*A.* No, sir; he had run up there where it was going to stop, and he did not slow up, and in fact going so fast he could not stop anyway. I did not fall before I got hold of the seat. I had hold of it a few seconds, and when it stopped it broke my hold and threw me forward.
\* \* \*

"*Q.* And did any one else lose their balance?

"*A.* I have been told.

"*Q.* Never mind, did you see any one?

"*A.* Yes, sir; I saw them staggering. I did not see them fall. My husband did not fall. He was against the back of the seat my friend was in."

Another witness testified, in part, as follows:

" We walked up to Chandler to get a seat. I got on the car first and walked towards the front, and there was only one seat, and I wanted Mrs. Ottinger to sit down, and she said, 'No, you sit down,' and I sat down, and she was holding on to the front of that seat, and someone made room, but she was holding on, and as she went to swing herself around, as near as I can remember it, the sudden stopping of the car broke her hold loose from the back of this seat, and she hit the seat against the front end of the car, and she arose, and it threw her against the seat she intended to sit on and down onto the floor, and onto her hand, which doubled up something like that (illustrating).

\* \* \*   At the time she fell I had a very good brace, for I was seated and had my hand on that seat in front of me.   I moved in my seat and struck my knees.   It gave me quite a shaking; but, owing to my brace with my left hand, I could not have fallen out."

There was other testimony to the same effect, and that it was a short block to Clay street from Chandler, and that there were a number of people at Clay street to get on, who could easily be seen from Chandler avenue.

There was testimony that there was no emergency calling for the sudden stoppage of the car, and that its stoppage was caused by the application of the brake by the motorman.

It will be observed that the accident was not caused by starting the car after plaintiff had boarded it, and before she could get a seat; but it was caused by its abrupt and sudden stoppage.

In *Howell* v. *Railway Co.*, 136 Mich. 432 (99 N. W. 406), Justice HOOKER, speaking for the court, said:

" The defendant owed to its passengers a high degree of diligence and care in transporting them, and that involved the character of the rolling stock.   It is not to be expected that a passenger can easily prove the exact particular in which the locomotive which draws his train is defective, or where the bridge which gives way with the train was weak, or the exact particular in which the company is wanting in diligence to prevent or avert a catastrophe.   Therefore, in such cases, the circumstances of the accident may sometimes justify an inference of negligence.   This was a question which it was proper for the court to leave to the jury, under the circumstances shown.

" The same may be said of the competency and conduct of the motorman.   There was testimony tending to show that the motorman did not know that he could stop the car by reversing the motor; that his tutelage had been brief; and, although there was proof showing the opposite, the question was one for the jury.   Again, there was testimony tending to show that he did not turn off the current, and that he lost his judgment and did not know what to do in

the emergency. The passenger is entitled to reasonable protection against all of these dangers, and it is not necessarily a defense that the motorman was confronted by an imminent and unexpected danger, whereby he lost his usual ability to control the car. While proper allowance should be made for such conditions, it is the duty of those who run cars and trains to put them in charge of competent men, and a reasonable degree of presence of mind may be an essential to competency."

In *Beattie* v. *Railway*, 158 Mich. 243 (122 N. W. 557), Justice MCALVAY, speaking for the court, said:

"The degree of care required to be exercised by carriers of passengers upon steam railways in securing the safety of passengers entering or alighting is ' the highest care, or the care which a very prudent person would have used under the circumstances.' This rule is also applicable to street cars.

" It is the duty of the street car to stop for the purpose of taking on or letting off passengers.

" ' The time of stoppage must be such as to enable the passenger attempting to get on or off to reach a place of safety, either on the street, or in the car, before it is started.' 6 Cyc. pp. 611, 615, 616, and cases cited.

" See, also, *Selby* v. *Railway*, 141 Mich. 112 (104 N. W. 376); *Burke* v. *Electric Co.*, 147 Mich. 172 (110 N. W. 524). The carrier is liable for injuries to a passenger caused by a disregard of this duty. We find no authority to the contrary."

It is a matter of common knowledge that a modern street car driven with its electric motor, and equipped with its air brake, is much more easily controlled than the cars which were drawn by horses and mules and equipped with a hand brake. The cars are made to carry the middle aged and the clumsy as well as the young and agile, and they have a right to board them, and, if in the exercise of due care, to be carried safely. We do not think it can be said as a matter of law that a passenger who is compelled to stand because there are not sufficient seats, and has hold of the back of a seat and is thrown violently forward against another seat by the sudden application of the

brakes, which haŝ the effect of stopping the car abruptly, there being no sudden emergency, is without remedy. I think the case ought to have been submitted to the jury under proper instructions.

Judgment should be reversed, and a new trial ordered.

BIRD, J., concurred with MOORE, J.